Blue & Gold Fleet LP v. United States Blue & Gold Fleet LP v. United States If I understand correctly, the appellees are going to divide their time. Mr. Dunn is going to take 10 minutes, is that correct, and go first? Yes, Your Honor. And then Mr. Garden is going to take 5 minutes and go second, is that right? Very well. Mr. Saltman, you can begin when you're ready. May it please the Court, Your Honor, this case involves a contract that was awarded to Hornblower that was not the one for which the offerors competed. Park Service materially modified the contract set forth from the prospectus. That is, on the eve of award, it changed the contract and required the contractor to pay no less than the service contract at wages and benefits. At the time of the solicitation, do you agree that your client was aware of the Service Contract Act issue? My client was not positive as to the application of the Service Contract Act, but did believe that, came to believe that it would be required and that evaluation would be done pursuant to the terms of the Service Contract Act. So why— Since it's the ultimate contractor. Why wasn't that raised at the time of the solicitation? It was not, Your Honor. I don't have an outstanding reason as to why it was not raised. It just was not raised. As Your Honor knows, we do not believe that the Court of Federal Claims has a rule like GAO, which requires the filing at that time, like 4CFR, which requires the submission of a protest prior to the date before receiving proposals. In particular, even if there was just discretion on the part of the court to decide whether or not my client had waived its rights, we believe that the court below improperly decided that issue because this is not a situation where there is a mere solicitation defect. We have a situation here where, in the absence of the requirement to evaluate pursuant to the Service Contract Act, we would have a contract that did not, in fact, conform to the law. But since this affects the evaluation of the bids, doesn't it make sense to require that issues like that be raised at the time of the solicitation so the solicitation can be corrected if it's mistaken? Well, that may be, Your Honor. However, there is no rule that has been adopted. And in any event, Your Honor, what I think is an equal, if not more important point, is that protesters, when they come before the Court of Federal Claims, they are not protecting merely their own interests, but they are challenging illegal procurement activities. So even if my client was remiss in not filing its protest prior to the receipt of proposals, we have here a significant issue that should be adjudicated. As it turns out, not only should it be adjudicated, but we were, in fact, correct. The Department of Labor has subsequently ruled that the service contract did apply. Nevertheless, the Park Service awarded this contract to someone who did not propose to comply with the service contract. But Mr. Saltzman, if you were that sure of yourself of being correct, why didn't you make the inquiry about the proposal, the RFP, whether or not the SCA did apply? I mean, you were sure it would apply, but you were not quite sure why it was not in the proposal. So why wouldn't it be prudent upon someone who's going to be bidding on a contract to inquire? When I say that we were sure, the solicitation did not make it absolutely clear, obviously, that the Service Contract Act was going to apply. We believed that the Service Contract Act should apply because of the nature of the services rendered, but the Park Service was adamant in its view and maintained that view throughout the litigation. Up until the time the Department of Labor ruled that the service contract did, in fact, apply. So if we had raised that, I don't think it would have mattered or not. The answer would have been that the Service Contract Act did not apply, at least as far as the Park Service was concerned. But you didn't raise it? It was not raised, Your Honor, no. If it had been raised, we wouldn't have had the time to initiate a vote. There's no doubt about that. Your Honor, that conflict situation now, has the contract been awarded and has it been amended to say that the Service Contract Act applies? Yes, Your Honor. And it also has been, the Department, the Park Service has sought, we say that the contract award violated the Service Contract Act because it was for ten years in length. After we made that argument to this Court, the Park Service went back to the Department of Labor, got a variance, which now allows the contract to be ten years in length. We believe, therefore, that the contract, as awarded to Hornblower on May the 9th, violated the Service Contract Act. Even though they were required to pay Service Contract Act wages, it was a ten-year contract. But at the end of the day here, if I understand correctly, after the contract has been amended, your complaint is that at the time of the evaluation of the bids, that your client's bid and Hornblower's bid would have been evaluated differently if everybody at that time had agreed that the Service Contract Act applies. That's correct, Your Honor. And it's not just my view. Judge Miller, in her comments, said that had the Service Contract Act applied, as we now know it should have, the evaluation would have been different for all offerors. We quote that extensively in our papers. Financial qualifications. No, it's not just financial qualifications. It's the wherewithal to do the job at the bid franchise. It's sort of the same thing. Well, perhaps, Your Honor. If the costs were too high, one would not be able to pay the high franchise fee. Your Honor, we believe that by unreasonably failing to recognize that the successful offeror would have been required to pay the Service Contract Act, that all offerors were not properly evaluated. Particularly now that, as I said, hindsight, we now know that the Service Contract Act did apply, no offeror was evaluated on the basis of the Service Contract Act, and yet we have an award. That was made on the basis of the, without the Service Contract Act applying. Your Honor, under the circumstances, we're under a different statute of regulations here than the normal federal procurement regulations of the FAR. The contract management, I'm sorry, the Concessions Management Improvement Act of 1998 says, and if Your Honor will allow me to quote it, that the Secretary of the Interior may not execute a concession contract which materially amends or does not incorporate the proposed terms and conditions of the contract set forth in the applicable prospectus. It did not, Your Honor. It materially changed it. Because the contract awarded required Service Contract Act wages be paid. The contract in the prospectus did not. That it was a material change, Your Honor, we cite in our papers two cases. One, the case out of the District Court in D.C., Maritime Transport Lines v. Lamy, and that case says if in fact the Service Contract Act is going to be required, Service Contract Act wages, then changing that after award is a material change. The GAO agrees with that, Your Honor. They recognize that in the MEE case in 1969, that dealt with a Davis-Bacon Act wage determination, but for all intents and purposes, it is the same, and they said there that an amendment incorporating such a wage rate change into a solicitation is a material amendment, regardless of its effect on price. Why, Your Honor? Because the contract awarded must have been the contract that everybody bid on. I talked about Judge Miller, and she said, and let me quote, that the application of the Service Contract Act would have had an impact on the evaluation of offers. It can't be any clearer. We're talking about an effect on offerors that, although the term is a protected term, it is not insubstantial. We're talking about a large, large impact on perhaps the largest single component of costs in the evaluation, labor, over a 10-year period. The application of the Service Contract Act is a huge element, and it would have substantially changed the way each and every one of the offerors were viewed. But, Mr. Solomon, right now you're challenging the issuance of the contract, aren't you, with respect to your original complaint was on the matter of the bidding. That's correct, Your Honor. So did you amend your complaint below? We, upon the award of the contract, Your Honor, we brought a second action in the Court of Federal Claims. At the suggestion of Judge Miller, we dismissed that action, filed an emergency motion before this Court for relief, an injunction pending appeal. In that, we requested in the alternative that if the Court did not believe that it was appropriate to continue that issue, those issues, in this appeal, that it remanded the matter back to Judge Miller. The Court did not see fit to do that in its appeal. They denied the motion. Yes, and did not, of course, remand it back to Judge Miller, which is why we're in front of you. Did you refile your complaint? Did we refile the complaint? No, we have not refiled the complaint, Your Honor. So that issue is not before us, then, is it? We believe that it is before you, Your Honors. We believe that it is an outgrowth of the protest. We say that the Service Contract Act should have been taken into account, and that the necessary ramifications of that would have been an award that did not include the Service Contract Act. Well, as it turned out, the award went forward, and the government, perhaps recognizing our argument, in fact, turned things on its head and indeed applied the Service Contract Act. But the Court of Federal Claims has not passed on it. The Court of Federal Claims has not passed on the legality of the award. That is correct. So it's not before us. In that sense, Your Honor, we would suggest that the Court, and I'm going into my rebuttal, but we would suggest that the Court remand this matter so that we can reopen the matter pursuant to Rule 60B of the Court of Federal Claims Rules. But this particular appeal, this was never before Judge Miller in this particular case, correct? I mean, you have a second case. The question of the propriety of the award? Right. No, because she decided her case three months before the award was made. So remanding this case for her to decide a different case would be a little confusing. Well, we think it's a continuation, Your Honor. All right. And so did she when we brought this matter to her attention. OK. Why don't we reserve the rest of your time for rebuttal? And we'll hear first, then, from Mr. Garden. You're taking 10 minutes. I'm sorry. I'm sorry. Yes, Mr. Dunn and then Mr. Garden. I have them in reverse order. Thank you. Thank you, Your Honor. May it please the Court. Blue and Gold missed its opportunity to challenge the terms of the contract related to the Service Contract Act. What would have happened if they had run in and said, Service Contract Act applies. You can't do this. I mean, is there any question that the National Park Service would have said that consistent with their regulations and their position under the Act as they viewed it, that that's wrong? Your Honor, anything I say now would be pure speculation. But assuming they have an issue with it, they would first raise it with the Park Service. The Department of Labor is the appropriate agency that interprets the application of the Service Contract Act. OK. I mean, in other words, what I'm asking really is, what's their remedy? They go to you. They go to the Park Service and they say, this solicitation is wrong. Park Service says, no, it isn't because the Contract Act doesn't apply. What do they do at that point? Do they have a remedy? Presumably, it would proceed exactly as it has proceeded after the fact in this case, which is that it was referred to the Department of Labor. The Department of Labor issued a letter expressing a preliminary opinion. And then the Wage and Hour Division issued its determination in the middle of September, September 15th. I believe that's been filed with the court. September 15th of 06? Yes. And the question is, I guess what I'm getting at is, is this something? Obviously, we're all interested in this setting. Mr. Saltman mentioned some of the important public policy considerations that bear on these kinds of questions. And one of them, among others, is not to have us going back and redoing contracts if we can avoid it. And the question here is, is there something that they could have done that would have actually advanced the ball and made it possible to get this resolved in advance of the bidding and award, rather than now, here we are, well, after the contract has been awarded? The first thing they should have done was raise the issue with the Park Service. Okay. The Park Service says, no. Where do they go then? The Department of Labor, Your Honor. And that's exactly what happened in this case, but it all happened after the fact. So they have the ability to raise the issue before the Department of Labor? They could go to the Department of Labor and say there's a pending solicitation and it contains a mistake because it says the Service Contract Act doesn't apply and we'd like you to rule that it does. They can go and do that. Your Honor, I don't know any, I don't have any citations for you on that, but I know that's exactly what happened after the fact here. And that's, you know, the proceedings were that the Department of Labor started looking into this. Who brought the action before the Department of Labor? I'm not sure, Your Honor. The Department of Labor has, I take it, investigators. They have wage and hour people. I assume they have people that cover this sort of thing. So you would make a telephone call to the appropriate office over there and they would open an investigation, I take it. Your Honor, I don't have an answer to that question. What I do know, I can tell you exactly what I know, is that the wage and hour division made its determination and there was, I guess, an investigation, as you stated, before that so it could come to that conclusion. And that is being appealed by Hornblower to the Administrative Review Board within the Department of Labor. Now the Park Service is determined not to appeal that decision. And the wage and hour division's decision is prospective. As of September 15th, the wage and hour division's decision said within 30 days you need to start applying the wages that are consistent with the Service Contract Act. Blue and Gold was aware of the National Park Service regulation that said that concession contracts are not service contracts within the meaning of federal statutes. Blue and Gold was aware that contracts subject to the Service Contract Act need to include an applicable wage and wage determination. Blue and Gold should have asked for clarification before submitting its proposal. Taking a wait-and-see approach to see if it was awarded the contract is contrary to the law, and there are many cases that we cite or have read that support that. Blue and Gold's arguments regarding the Department of Labor proceeding are irrelevant. This is all after-the-fact information. A bid protest requires the examination of the information that was before the agency at the time it made its decision. It would be great to have a crystal ball and know what would happen in the future, but all of this begs the question, where do you draw the line? If we look at the wage and hour division's determination, do we draw the line there or do we wait and see what the Administrative Review Board will determine? Or do we see if it will be appealed to the district court after that? There has to be a line, and the line should be the information that the agency had at the time it made its decision. The Park Service waited nine months from selecting Hornblower to award the contract, and that allowed Blue and Gold the opportunity to fully litigate this before the court of federal claims. The Park Service did not push this through. The Park Service did everything in its power to delay this so that Blue and Gold had the opportunity to have it stay in court. How long was it between the issuance of the solicitation and the decision on the bids? There was a notice of availability on the prospectus issued in July of 2004. In April, the panel evaluation summary, which outlines the panel's basis for its decision, was issued or dated August 2005. The National Park Service Director's Office notified the Regional Director's Office that it concurred with the panel evaluation summary on September 22, and on September 26, the offerors were notified of the Park Service's decision. At that time, shortly thereafter, Blue and Gold filed its protest with the GAO's office. And then shipped it over? Yes, and then it went to the court of federal claims. So it was almost a year between the time that the solicitation was issued and the panel decision was made. Yes, and there were intervening events that delayed the submission of the proposal. I think the proposals were finally submitted in March of... It would be March of 2005. Yes, March of 2005. And that's why the panel evaluation took place in April of 2005. August, you said. Well, there was a meeting that took place shortly after. Oh, the original evaluation followed by the decision in August 2005. The decision was written, the evaluation summary was written and dated, I guess it was written between April and August, but it was dated August 2005. It's almost a 200-page document. Your Honor, I could reach the factual issues regarding ground trips, the date of repowering the vessels and the solar sailors, but that doesn't seem to be an issue at this time. I can continue to talk about the service contract act issues more. But if you want me to reach these other issues, I'd be happy to. It just doesn't seem like there's much interest in these issues. How about the subsequent contract amendments? Yes, Your Honor. The contract was not amended. There was an applicable laws clause, and that's located in the joint appendix at JA6725. It's a very broad definition. Is that properly before us, though? Excuse me? Is that properly before us? No, Your Honor, that is not properly before the court at this time. This is a pre-award bid protest. What happened? If the contract wasn't amended, what happened here now? The Park Service has agreed with the Labor Department determination that the service contract act applies. So where are we in terms of what the contract says? Well, the Park Service has decided not to appeal the Wage and Hour Division's determination. I just want to make that clear for the record. It did not agree with the Wage and Hour Division's determination. So what's happened? I mean, has the contract been amended? You say it hasn't been amended. It has not technically been amended, because what happened was there isn't applicable laws to provision within the contract. So whatever the law happens to be affects the contract and renders null and void any provision of the contract to the country. Your Honor, there was a letter agreement that incorporated the preliminary injunction that the district court would in California as long as it's effective. So if it's not effective, it's not incorporated as an applicable law. Okay. And, Your Honor, finally, I'd like to address the material modification issue that Bloom Gold raises. Once again, this issue is not properly before the court. The contract that was awarded is not the subject of this appeal. And further, the contract is essentially the same. It calls for the same services, the same term. And because this is a concessions contract, the Park Service doesn't pay anybody. There's no increased cost. The concessioner pays the labor cost itself. So there are no increased costs to the National Park Service. Now, you're representing... I'm sorry. Go ahead. But the fee could diminish, couldn't it, as part of the process? The fee to the Park Service. No, the fee to the Park Service won't. I think it's a 26% franchise fee. So the only thing that would affect... But is that on gross or net? I don't know the answer to that question at this time. If it's on net with increased labor cost, it's going to be lower. I don't know the answer to that question, Your Honor. But I do know that the franchise fee stays essentially the same. So I'm sorry I can't give you a better point to answer that question. I apologize. Why don't we hear from Mr. Gardner now? I think we don't want to... Just before you sit down, just one comment. And this is really to all parties. I find the things that are marked confidential in the briefs to be far beyond what anybody could argue could properly be marked confidential, including how many employees were on the board that evaluated these proposals, the general nature of the evaluation. You guys shouldn't be doing this. That essentially renders the briefs incomprehensible to somebody who's trying to read the public version. I'm glad Judge Beck raised that, because I was going to actually ask a question at the end, and we'll let the time... If you could restart with Mr. Gardner at 5. I just want to elicit from the party, since we may have to write an opinion in this case, writing an opinion with a third of all the material in the briefs marked confidential either puts us in the position of being accused of having revealed confidential matters or makes it very difficult to write around the confidentiality provision. So in addition to the difficulty of reading the briefs, there's the difficulty of writing anything. I guess this comes, correct me if I'm wrong, from the practice in bid protest cases of rendering large amounts of material confidential, and this is just a carryover because those protective orders exist and continue unless changed, I take it. But we would welcome, and in fact I would ask, the parties to get together and submit to us any material that's now marked confidential, which you continue to believe ought to be protected, and please let us know within 10 days, if you could, if there's any of the material now marked confidential in the briefs that you wish us to continue to respect, and please be very restrictive in what you consider to fall within that category. That would be of great assistance to us in trying to... Your Honor... Sure, yes, you can go ahead. I have only one problem with the 10 days, is that I'm going to be out of the office for most of it. Okay, well, would a longer period of time... Actually, Your Honor, would it be safe to give us another week? Sure, that's fine. I think that'll be fine, and if each of you, if that's not a problem for the other parties, we'd appreciate that. Fair enough. Ms. Thomas, if you could start Mr. Gordon's time over. Your Honor, I just ask one question for clarification.     if that's not a problem for the other parties, would it be convenient, would you rather us resubmit our briefs with that confidential material? Here's our thought. It may be the case, if you can tell us, in the end, that there isn't anything there that needs to be protected, then we can effectively render these public. If we end up with some significant amount, but much less than we now have, we may find it, for our own records, most helpful to have something new. But let's see how things go. Your Honor, I think that that is exactly what you're going to get. Which is? You are going to get perhaps half or less that's still protected. You expect that there will still be things that people will want to protect? And as such, I think that Your Honor might be better assured by providing you with, if you will, a less restrictive version of the briefs. But still indicating that which we... Well, I tell you what, and since everybody's in a very cooperative mood here, why don't we do this? Why don't we ask the three of you to get together either now, after argument, or at some time convenient to you, given your travel schedule, and try to see, number one, if you can work out a reduction to a bare minimum of what needs to be protected, and two, if it isn't unduly burdensome to submit new briefs in accordance with what you're able to work out by way of an accommodation on the confidential materials. As Your Honor probably is aware, each one of us is responsible, of course, to protect our own information. Sure. Sure, but... But you can't affect somebody else's, I understand. Fine. I think probably what we need to have happen is for, in a, what did I say, 10 days plus a week, let's say 21 days, if you could get back to us a letter to the court indicating what you've been able to agree upon, and if you wish at that point to propose filing new briefs, that would be most welcome. I think that's probably the best solution. It's not only the briefs, but also the appendices. I think there's a lot of material in the appendices. Well, what do we do when you're referring to the appendices in the briefs? Yeah. That's part of the major problem that I had. I think that we may want to direct that to Mr. Dunn. I think much of the appendix material really belongs to the defense. Your Honor, with respect to the proposals, the Park Service protects the propriety of the information in the proposals at the request of the offerors. Right. So, if the offerors, you know, are more than okay with... You don't have any independent concerns. Now, with respect to the evaluation summary, which is the Park Service document in there, that to a certain extent, you know, tells how the Park Service comes to its decisions, I'd love to take a look at that and make a determination. All right. Well, we may have to revisit this after our 21 days, but do see very clever people and see if you can put your minds together and come up with something. You understand our problem, and I think we understand your problem, and I think we can probably make substantial progress without making it too burdensome for your clients. So, see what you come up with, and we'll go from there. Thank you. Thank you. Now, with that said, Mr. Dunn... I mean, sorry, Mr. Garden. We have you in the wrong order here, so I keep making a mistake. Go ahead. It's better to hide, Mr. Garden, to make sure it's clear. I appreciate that. What I'd like to do then, having listened to all those questions and counsel before me, is rather than give you a presentation, address what I think are the issues the court has. The first one I think is, Your Honor, is that in fact it is gross fee. So the reduction, increase in cost would not affect the fee, but I'm going to say gross fee, so that's not relevant. Also, Your Honor, I was interested when Mr. Saltman stood up, his first argument out of the box was the fact that this was all about the award decision, which obviously, as we agreed, also is not profitable for this court. But what we point out to the court, though, is footnote 23 of Judge Miller's opinion below, because what happened was the Blue and Gold raised the possibility for Judge Miller that down the road they may have to modify this contract and they may have to incorporate the service contract back. And Judge Miller heard that presentation by Blue and Gold and says, it does not matter. You still do not qualify for an extraordinary amount of income because you are too late. You stand on your rights. So while these specific facts of the award and all the details and the calculations that counsel raises were certainly not profitable for this court because they were not reviewed by a court below, the general situation was in fact addressed by Judge Miller. The only body or forum that did in fact hear this argument was the GAO. As the Court may recall from one of the earlier denials of injunctive belief, Blue and Gold did file a protest at GAO about the award and that was dismissed because, once again, for entirely different bases, it was untimely. Once again, they waited too long. And they filed that protest, at least for GAO's rules, too late. But obviously that also does not count as a sufficient basis for Blue and Gold to bring an appeal at this level right now. The other point that struck me from Mr. Salter's presentation was they seemed to be making the argument, something I'm unaware of, the futility argument, that there was no reason for us to challenge the applicability of the SCA because, in our minds, it was clear that the agency was not going to change their mind. We never had a chance to brief that because the very first time that was raised at general argument was in their reply brief. So we think the purpose of this appeal certainly has been waived. It was certainly not presented before Judge Miller, who was trying to weigh the public interest in this case. If counsel thought that that was a consideration Judge Miller should undertake, they should have presented it to her. They did not. So I think this court's rules are clear. That's been waived. Under the Department of Labor rules, could Blue and Gold file for determination of whether the Service Contract Act applied? It could, Your Honor. I'm not, obviously, experiencing the Service Contract Act specifically, but whether or not it would be Blue and Gold or their employees, because there really isn't much of a difference here because what happened was Blue and Gold's employees, their union, did, in fact, go file afterwards an application of DOO that the Service Contract Act apply. They used declarations from Blue and Gold's officers to do that. So clearly there's a communion of interest here. They proceed. They use each other's names when they need to, but they're obviously all after the same thing. Also what I want to point out is, Your Honor, talking about would they have done any good, what are your other remedies? Well, one of them was GAO, and they went there and they were too late. One of them is a court of federal claims. They could have protested the terms of the solicitation before the agency undertook the extensive evaluation in this case and before they knew they lost, but they didn't do that. They also could have done exactly what they did after they found out they lost, which is go to the district court and seek some kind of relief from the court. That's, in fact, what they did do later on, and that's, in fact, what's brought this whole argument to bear. So they had a lot of remedies available to them. I think it was Your Honor's question of the timing. This took a long time. This process was very extensive. Every bit of opportunity to complain and file was given, and notwithstanding that, notwithstanding these other remedies, none of them were taken. So it wasn't a matter of they had no time. The agency was pushing this through. There was plenty of time. It was proceeding at a pace where these remedies could have been pursued before. Now, just to touch on the number of boat trips. I take it it's the case, is it not, that in order to get ten boatloads of people over, have them visit for a while, and then bring them back, you need to run more than ten round trips of boats. Quite possible. The problem we had was a couple of things. First of all, I'd say as much as possible. Not having any experience with operating this condo, I know that you will both have, we had no idea what that additional number might be. There was a number in the prospectus. We took it. We used it. It was the one solid number, if you will, the bare minimum number in the prospectus that was available. That's the one we used. Now, Blue and Gold maintains that it was clear that there was another number. Well, the other number they pointed out to the court is also not a number that was in their proposal. So at a minimum, I think, you'd have three years of MEU. It's not clear what number you should use. Again, an issue that you need to bring up before re-evaluations occur, so they can get clarified the same amount of time. So we believe that even if that were an issue, it was something that also should have been raised beforehand, but was not. But certainly the agency's decision was rational in evaluating our proposal to the extent that that number was relevant to the evaluation. We used the only hard number that was in the prospectus. When you used in your budget figures, you used the number 10. That seemed to correlate with 300 persons per boatload and a total of 3,000 people, for example, in the month of January. It sounded like your 10 was a reference to the actual full boatloads, as opposed to the number of times that boats might have to go back empty, for example, to somebody... You wouldn't be taking people back to Alcatraz after 2.15 in the afternoon, because that was the last trip, but you'd still have to go back and pick up a couple of boatloads of people who had arrived at 2.15. Correct. So in your budgeting, you might not be able to answer this, but to the extent that you can, was your budgeting budgeting according to the number of full boatloads of people and just simply saying, well, the rest of it is just sort of overhead, the number of times you have to shoot the boat back and forth, or what? I don't have a specific recollection, but I believe it was based on,  The problem we have is there's an overlap, and obviously we talk about the number of people. No more people can go over, they can come back. Well, that's true, but they come at different times, which is your problem. That's why you're going to end up with some empty boats. Exactly. The prospectus we used, we thought we went with as best we could with the prospectus show without further clarification. Oh, okay. All right. Unless the court has further questions, it's my time to go. I think that's fine. Thank you. Thank you. And Mr. Saltman, I think you do have some time left. I do. Yeah, three minutes. Your Honor, I think there's a couple of points that I think the court needs to hear. The question of whether the Service Contract Act applied was presented to the Department of Labor by the unions that represent the employees for blue and gold on November 30th of 2005. That was during the initial stages of the big protest that the Court of Federal Claims. The Department of Labor, in its deliberative process, took nearly a year to decide the question. It did not rule until September 15th, 2006. We think in part that was due to... And I know this is a fact that there were some slow responses by the Park Service during the course of the big protest. I think that they stood to benefit from not having this matter resolved by DOL, and they took actions to be sure that that did not, in fact, occur. That was done after the issuance of the contract to... No, it was during the big protest. No. It was done... The notification went out on 9-22-05, right? That's correct. That the... And the DOL complaint... The DOL complaint was filed on November 30th, 2005. Of 05, that's right. So it was done after the contract was issued. No, after Hornblower had been selected for award. The award did not occur until May 9th, 2006. Six. Do you agree that you could have gone to the Court of Federal Claims before the selection to complain about the solicitation? It would have been possible to do that. Yes, Your Honor. Your Honor, we also would not be here, however. The union... Mr. Gardner made a comment that Blue and Gold had gone to the district court to seek a declaratory judgment with regard to the Service Contract Act. That's not true. The unions for the employees of Blue and Gold did, in fact, file a declaratory judgment out in California on the... 1st of May of 2006. That court issued a preliminary injunction in joining the Park Service from awarding any contract that did not include the Service Contract Act wages. If the Park Service... Judge Bryson, you seem concerned... No, no, I'm listening. If the Park Service had not, in the face of that, rushed to make an award, but rather had waited until DOL did rule, ultimately, we wouldn't be here today, Your Honor. Because DOL, as we know, ultimately concluded that the Service Contract applied. They would have rendered that opinion, the award would not have been made, and the Park Service would have done what was ever appropriate in the face of that ruling. What the Park Service did do is, after the judge in the District Court in California issued her opinion, they amended the term applicable laws, as Your Honor pointed out, in the contract, to include the preliminary injunction. So there was, in fact, an amendment of the contract that was, the draft contract that was in the prospectus. Again, in violation of the Concession of Management Improvement Act. Moreover, in response to, I believe, Your Honor's question, the contract was further amended in October of 2006 to expressly include all of the requirements of the Service Contract Act. Your Honor, if I might, just one point further. Mr. Gardner talks about footnote 23 to Judge Miller's opinion below. And that, in turn, references 29 CFR section 4.5C. The government and Hornblower take that as carte blanche authority for the amendment of an awarded contract to come in after the fact and make the Service Contract Act applicable. However, that is not what the regulation says. The regulation does talk in those terms. But it suggests, Your Honor will allow me to quote, that the agency, in this case it would be the Park Service, should exercise any and all authority that may be needed, including, where necessary, the authority to negotiate or amend or authority to pay any necessary additional costs. It also goes on to talk about cancellation or termination of the contract where appropriate. We think that this is clearly not carte blanche to come in after the fact and change the ground rules upon which the solicitation was issued and the evaluation was made. In some circumstances, it can be done without violating competition. This was not one of them. And this regulation does not give the agency that carte blanche. Thank you, Your Honor. Thank you, Mr. Saltzman. And thanks to all counsel. We will look forward to seeing the fruits of your collective labors in about 21 days then.